**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

VISANJI GALA and
JAYA GALA,

    Plaintiffs,

v.

TESLA MOTORS TN, INC.,
and TESLA MOTORS, INC.,

    Defendants.

Civil Action No.: 2:20-cv-02265-SHM-tmp

JURY DEMANDED

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO COMPEL ARBITRATION AND FOR DISMISSAL**

---

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA") and Rule 12 of the Federal Rules of Civil Procedure, Defendants Tesla Motors TN, Inc. and Tesla, Inc. (sued herein as Tesla Motors, Inc.) (collectively, "Tesla"), by and through counsel, submit this memorandum in support of their Motion to Compel Arbitration and for Dismissal.

**I.    INTRODUCTION**

Plaintiffs are Tennessee residents. One of them, Mr. Visanji Gala, leased an electric vehicle from Tesla, agreeing on two separate occasions—and in two separate documents—to arbitrate any dispute "arising out of or relating to any aspect of [his] relationship" with Tesla, which plainly includes the alleged vehicle malfunction at issue in this case. Mr. Gala was given the opportunity to opt out of his agreement, but made no attempt to do so. The other, Plaintiff Jaya Gala, appears to be Mr. Gala's wife. She is not a party to the lease documents and has no relationship with Tesla, but nevertheless seeks to enforce Mr. Gala's agreements with Tesla in this lawsuit. Under the FAA

and state-law principles of estoppel, both Plaintiffs are bound to arbitrate their disputes with Tesla, and both should be compelled to arbitration.

## II.  STATEMENT OF RELEVANT FACTS

Tesla sells and leases electric vehicles on its website and in Tesla-owned stores. *See* Compl. ¶ 5. Mr. Gala leased a Tesla Model S vehicle directly from Tesla. Declaration of Jasjit Ahluwalia ("Ahluwalia Decl.") ¶ 4, Ex. A (Ahluwalia Decl. attached as Exhibit No. 1 to this Memorandum)[1]; *see* Compl. ¶ 9. As explained below, Mr. Gala agreed, on two separate occasions and through two separate documents, to arbitrate "any dispute arising out of or relating to any aspect of the relationship" with Tesla, and had ample time to review (and opt out of) this arbitration agreement.

**Mr. Gala's first arbitration agreement.** Mr. Gala first agreed to arbitrate when, on September 10, 2019, he configured his Model S vehicle online and clicked (or authorized another party to click) the "Place Order" button on the website. The "Place Order" button is depicted below as it existed on Tesla's website on the date of Mr. Gala's order:



---

[1] The declarations attached to this memorandum have been electronically signed by the declarants pursuant to COVID-19 social distancing policies.

Declaration of Victor Barclay ("Barclay Decl.") ¶¶ 2-3, Ex. B (Barclay Decl. attached as Exhibit No. 2 to this Memorandum).

As shown above, the text immediately above the "Place Order" button states: "By clicking 'Place Order' I agree to the Model S Order Agreement…." *Id.* The phrase "Model S Order Agreement" is displayed in blue font and is a hyperlink that, when clicked, opens a new Internet-browser window to reveal the "Motor Vehicle Order Agreement" (hereinafter, "Order Agreement"). *Id.* ¶ 4, Ex. C. Tesla's records show that Mr. Gala placed his order on September 10, 2019. Ahluwalia Decl. ¶ 4, Ex. A; Barclay Decl. ¶ 2.

Page 3 of the Order Agreement includes an "Agreement to Arbitrate" framed in a standalone text box, which reads as follows:

> **Agreement to Arbitrate.** Please carefully read this provision, which applies to any dispute between you and Tesla, Inc. and its affiliates, (together "Tesla").
>
> If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com.
>
> If not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules. This includes claims arising before this Agreement, such as claims related to statements about our products.
>
> We will pay all AAA fees for any arbitration, which will be held in the city or county of your residence. To learn more about the Rules and how to begin an arbitration, you may call any AAA office or go to www.adr.org.
>
> The arbitrator may only resolve disputes between you and Tesla, and may not consolidate claims without the consent of all parties. The arbitrator cannot hear class or representative claims or requests for relief on behalf of others purchasing or leasing Tesla vehicles. In other words, you and Tesla may bring claims against the other only in your or its individual capacity and not as a plaintiff or class member in any class or representative action. If a court or arbitrator decides that any part of this agreement to arbitrate cannot be enforced as to a particular claim for relief or remedy, then that claim or remedy (and only that claim or remedy) must be brought in court and any other claims must be arbitrated.

> If you prefer, you may instead take your individual dispute to small claims court.
>
> You may opt out of arbitration within 30 days after signing this Agreement by sending a letter to: Tesla, Inc.; P.O. Box 15430; Fremont, CA 94539-7970, stating your name, Vehicle Identification Number, and intent to opt out of the arbitration provision. If you do not opt out, this agreement to arbitrate overrides any different arbitration agreement between us, including any arbitration agreement in a lease or finance contract.

Barclay Decl. ¶ 4, Ex. C.

After Mr. Gala placed the order, Tesla made a copy of his Order Agreement available to him by uploading it to his personal Tesla Account. Ahluwalia Decl. ¶ 5. The Order Agreement provided Mr. Gala with a 30-day period to opt out of the arbitration agreement. *Id.* ¶ 4, Ex. A. He did not opt out. *Id.* ¶ 6.

**Mr. Gala's second arbitration agreement.** On October 11, 2019, Mr. Gala electronically signed a copy of his final lease agreement ("Lease Agreement"). Declaration of Jacob Gough ("Gough Decl.") ¶¶ 11-12, Exs. E, F (Gough Decl. attached as Exhibit No. 3 to this Memorandum). To do so, Mr. Gala (or someone acting on his behalf) had to click a link in an email that notified him that his Lease Agreement was ready to sign. *Id*. ¶ 5. That link, in turn, directed him to an online e-signature platform where he entered his name and email address, and checked a box affirming that he had "reviewed and agree[d] to be bound by the terms of the ESIGN Consent for use of electronic documents and signatures." *Id*. ¶ 5, Ex. A. Mr. Gala then clicked a green button labeled "Begin" and was directed to a complete copy of the Lease Agreement for execution. *Id*. ¶¶ 5-6, Ex. B. Mr. Gala then had to scroll through the entire agreement to reach the signature line on the last page. *Id*. ¶¶ 6-7, Exs. B, C. When Mr. Gala clicked on the signature box, which was highlighted, the system generated a visible electronic signature, and he then clicked "Apply Signature" to complete the process. *Id*. ¶¶ 7-8, Exs. C, D. Finally, Mr. Gala was given an

4

opportunity to download, or email himself, a copy of the signed Lease Agreement. *Id*. ¶ 8. The Lease Agreement attached to Plaintiffs' Complaint matches the Lease Agreement in Tesla's records. *Id*. ¶ 12, Ex. F; Compl., Ex. A.

The executed Lease Agreement, at page 3, contains the same "Agreement to Arbitrate" that was included in Mr. Gala's Order Agreement. Compl., Ex. A; Ahluwalia Decl. ¶ 4, Ex. A. Mr. Gala, again, made no attempt to opt out. Ahluwalia Decl. ¶ 6.

**The Warranty.** Plaintiffs' arbitration obligations are further reinforced by Tesla's New Vehicle Warranty ("Warranty") which Plaintiffs purportedly seek to enforce. *See* Compl. ¶¶ 7, 24-26. The Warranty includes an express reminder that "you agreed [in your Motor Vehicle Order Agreement] to resolve disputes with Tesla by arbitration rather than by litigation in court," and reprints the full text of the arbitration agreement "[f]or your convenience."[2]

**The Complaint.** The Complaint does not dispute the validity of the Lease Agreement and, in fact, all six of Plaintiffs' alleged claims—rescission, "breach of contract/warranty," three additional warranty claims, and a fraudulent inducement claim—depend on its existence and validity. *See, e.g.*, Compl. ¶¶ 26 & pp. 4-7. Moreover, while Mrs. Gala did not herself sign any agreement with Tesla, she repeatedly asserts the existence of a valid Lease Agreement between herself (along with Mr. Gala) and Tesla. *See, e.g.*, Compl. ¶ 7 ("…*Plaintiffs* leased a 2019 Model S…. A copy of the Lease Agreement is attached hereto…"); ¶ 9 (alleging that "*Plaintiffs*… executed" the lease); ¶ 26 ("The parties contracted to lease the vehicle to the *Plaintiffs*…"); ¶¶ 33-34 (alleging that "*Plaintiffs* were relying on Defendant's representations" about the vehicle "[a]t

---

[2] Tesla's New Vehicle Limited Warranty is available here: https://www.tesla.com/sites/default/files/downloads/tesla-new-vehicle-limited-warranty-en-us.pdf.

the time the contract papers were signed"); p. 7 (Prayer for Relief) (seeking rescission of Defendants' "contract with the *Plaintiffs* to lease the vehicle").

### III. THE COURT SHOULD ORDER BOTH PLAINTIFFS TO ARBITRATION

Mr. Gala agreed to arbitrate "any dispute arising out of or relating to any aspect of the relationship" with "Tesla, Inc. and its affiliates," and the incident alleged in the Complaint unquestionably qualifies. Mrs. Gala did not (as far as Tesla knows) expressly assent to arbitration, but alleges in the Complaint that she is party to the Lease Agreement, which contains the arbitration provision, and asserts claims and seeks relief arising from the Lease Agreement. As a result, she is estopped from refusing to arbitrate, and she too must be ordered to arbitration.

**A. Legal Standard on a Motion to Compel Arbitration.**

The "overarching purpose" of the FAA, 9 U.S.C. § 1 *et seq.*, is "to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 334 (2011). By passing the FAA, Congress expressed "a strong presumption in favor of arbitration." *Myers v. TRG Customer Sols., Inc.*, No. 1:17-CV-00052, 2017 WL 5478398, at *2–3 (M.D. Tenn. Nov. 15, 2017) (citing *Hornell Brewing Co.*, 340 F.3d 345, 355 (6th Cir. 2003)). Courts apply that presumption by resolving "any doubts regarding arbitrability . . . in favor of arbitration." *Id.* (citation omitted).

On a motion compel arbitration under the FAA, a court has four tasks:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of the agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000); *see also Uszak v. AT&T Mobility Servs., LLC*, 658 F. App'x 758, 761 (6th Cir. 2016).

Because of the strong federal presumption favoring arbitration, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

### B. Mr. Gala Agreed to Arbitrate the Disputes in This Case.

In two separate agreements, Mr. Gala broadly agreed that "any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator," including "claims arising before this Agreement, such as claims related to statements about our products." Compl., Ex. A; Ahluwalia Decl. ¶ 4, Ex. A.

The claims asserted in the Complaint are doubtless subject to this arbitration agreement. Mr. Gala ordered the vehicle pursuant to the Order Agreement, and leased the vehicle pursuant the Lease Agreement. He alleges that he experienced a malfunction in the vehicle, Compl. ¶ 10, and asserts (along with Mrs. Gala) different warranty claims, a claim for breach of the Lease Agreement, and a claim for fraudulent inducement premised on Tesla's alleged representations about the vehicle. Compl. ¶¶ 20, 23 & pp. 4-7. All of these claims "aris[e] out of or relat[e] to [some] aspect of the relationship between [Mr. Gala] and Tesla" and must be arbitrated.

### C. The Arbitration Agreement Is Valid and Enforceable.

To determine whether a valid arbitration agreement exists, federal courts generally "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The enforceability of the arbitration agreement here is governed by Tennessee law.[3]

---

[3] The Order Agreement prescribes application of "the laws of the State in which we are licensed to sell motor vehicles that is nearest to your address indicated on your Vehicle Configuration," which is Tennessee. Ahluwalia Decl. ¶ 4, Ex. A, at 3 (Governing Law); Compl. ¶¶ 2, 3, 6.

Mr. Gala's arbitration agreements are plainly enforceable. When Mr. Gala clicked his assent to the Order Agreement, the Tesla website informed him: "By clicking 'Place Order' I agree to the Model S Order Agreement, Supercharger Fair Use Policy, the Customer Privacy Agreement and consent to be contacted at the number provided with more information or offers about Tesla products. …" Barclay Decl. ¶ 2. The text "Model S Order Agreement" was blue to indicate a hyperlink to the Order Agreement. *Id.* ¶ 3, Ex. A. Beneath this text, Mr. Gala clicked the bright blue "Place Order" button signaling his assent and placing his order. Ahluwalia Decl. ¶ 4, Ex. A; Barclay Decl. ¶ 2. A copy of the Order Agreement, which contained the arbitration provision, was uploaded to his Tesla Account. Ahluwalia Decl. ¶ 5.

As detailed in Section II, *supra*, Mr. Gala again agreed to arbitrate when he electronically signed the Lease Agreement on October 11, 2019. Gough Decl. ¶¶ 10-12, Exs. E, F. There is no doubt he did so and retained a copy, as Mr. Gala attaches the electronically signed version of the Lease Agreement to his Complaint as Exhibit A. Tesla's records confirm that the electronically signed Lease Agreement attached to the Complaint is substantively identical to the version he agreed to on October 11, 2019. *Id.* ¶ 12, Ex. F; Compl., Ex. A.

In the online context, courts hold that a deliberate act that shows assent is equivalent to a handwritten signature: it manifests a consumer's assent to an agreement's terms, including arbitration provisions. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) ("Courts around the country have recognized that this type of electronic 'click' can suffice to signify the acceptance of a contract."); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (noting that click agreements are "routinely upheld by circuit and district courts" (altered)).

The terms of such online agreements are frequently contained in hyperlinks, and are routinely enforced against the consumers who assent to them. *Carey v. Uber Techs., Inc.*, No. 1:16-

CV-1058, 2017 WL 1133936, at *4 (N.D. Ohio Mar. 27, 2017) ("[C]licking through relevant screens . . . in order to sign up to use the . . . product, is an acceptable method to manifest assent to the terms of an agreement even where disputed terms are contained in a hyperlink" (quotation marks and citation omitted)); *Fteja*, 841 F. Supp. 2d at 841, 844 (enforcing hyperlinked terms); *Nguyen v. Tesla, Inc.*, No. 819CV01422JLSJDE, 2020 WL 2114937, at *1 (C.D. Cal. Apr. 6, 2020) (enforcing earlier version of Tesla's hyperlinked Order Agreement); *Raebel v. Tesla, Inc.*, No. 319CV00742MMDWGC, 2020 WL 1659929, at *3-4 (D. Nev. Apr. 3, 2020) (same).

This applies even if the user claims he did not actually view the terms of the agreement. *See, e.g.*, *Fteja*, 841 F. Supp. 2d at 839-40 (enforcing hyperlinked agreement, despite plaintiff's claim of ignorance, because plaintiff "was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences. That was enough."); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011) (enforcing blue-hyperlinked agreement where plaintiff was "provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button").

For example, in *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017), the court vacated a denial of a motion to compel arbitration, holding that the plaintiff unambiguously "clicked" his assent to the app-based contract depicted below (in reduced size):



9

*Id.* at 78-79 & Addendum B. Numerous factors compelled this conclusion, including: (1) "the transactional context of the parties' dealings," (2) the proximity of the hyperlinked terms to "the mechanism for manifesting assent—i.e., the register button," (3) the fact that the terms were provided "simultaneously to enrollment," and (4) language signaling the creation of a contract ("By creating an Uber account, you agree . . ."). *Id.* at 78-80.

      Here, there is no question that Plaintiff assented to the Order Agreement and the Lease Agreement, including the identical arbitration agreement contained in each. The Order Agreement shares all the core features that compelled enforcement of the arbitration agreement in *Meyer*. Specifically, as depicted again below, Tesla's hyperlinked terms are presented in a patently commercial context—the purchase of a $90,000 premium sedan, are located immediately below the "Place Order" button that signals assent, and are presented with language signaling the creation of a contract ("By clicking 'Place Order' [you] agree to the Model S Order Agreement . . ."):



*See* Barclay Decl. ¶¶ 2-3, Ex. B; Compl., Ex. A. So too with the Lease Agreement. Plaintiff agreed to the Lease by clicking on a link in his email, navigating to the eOriginal website, entering his

10

name and email address, consenting to electronically sign, manually scrolling through the Lease Agreement, clicking on the signature line to apply his e-signature, and then clicking "Apply Signature." Gough Decl. ¶¶ 5-8, 11. There can be no question that Mr. Gala agreed to arbitrate.

Nor can Mr. Gala claim that the arbitration agreement is unfair or unconscionable. The *Elliot* decision from the Middle District of Tennessee is instructive. There, plaintiffs argued that because the arbitration clause was part of a take-it-or-leave-it contract, they did not truly assent. The Court disagreed, emphasizing that plaintiffs (1) were not hurried "as they accessed [the agreement] themselves via the online application process," (2) were not "deprived of time to consult an attorney," (3) did not "suffer from educational limitations," and (4) were not misled about the agreement's terms. *Elliot v. NTAN, LLC*, No. 3:18-CV-00638, 2018 WL 6181351, at *4 (M.D. Tenn. Nov. 27, 2018). Accordingly, the court ruled that "the plaintiffs mutually assented to the Applicant Agreement when they signed it" and compelled the case to arbitration. *Id.*

The case for arbitration is even stronger here. Mr. Gala had access to the Order Agreement at the time of his order, and received a copy in his Tesla Account after he assented. Ahluwalia Decl. ¶ 5. Mr. Gala does not allege he was deprived of the opportunity to consult an attorney, suffered educational deficiencies, or was misled about the contract's terms. But unlike in *Elliott*, Mr. Gala also had the right to opt out of arbitration (which he did not do), was making a $90,000 purchase, and subsequently re-assented to the same arbitration clause by signing his Lease Agreement. Mr. Gala cannot escape arbitration in these circumstances.

11

### D. Mrs. Gala Is Bound to the Arbitration Agreement by Estoppel.

Mrs. Gala did not herself assent to Tesla's arbitration agreement through the Order Agreement or the Lease Agreement. Nevertheless, she is bound to the arbitration under well-established state-law principles of estoppel.[4]

Generally speaking, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). However, it is well established that "a nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a *direct* benefit from the contract while disavowing the arbitration provision." *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) (discussing *Thomson–CSF v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995)).

In the Sixth Circuit, and in Tennessee, it is clear that nonsignatories must arbitrate where they assert claims—such as for breach of contract and warranty—that depend on the existence of the contract containing an arbitration clause. *See, e.g.*, *Javitch*, 315 F.3d at 629 (vacating denial of defendants' motions to compel arbitration and remanding for estoppel determination based on whether plaintiff nonsignatories sought "to benefit . . . from the customer agreements that contained the arbitration clauses"); *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 620 (Tenn. 2004) ("[W]e conclude that an arbitration provision in a contract is enforceable against a third-party beneficiary who has filed a cause of action seeking to enforce the contract."); *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 271 (Tenn. 2017) ("[W]e hold that a

---

[4] To the extent that Mr. Gala claims he is for any reason not bound by the arbitration clause in the Lease Agreement and Order Agreement, this argument applies equally to him.

nonsignatory third-party beneficiary is bound to an arbitration provision in a contract to the extent that the beneficiary's claims seek to enforce the contract").[5]

The posture here is strikingly similar to that in *International Paper*, 206 F.3d 411. Plaintiff sued the manufacturer of an industrial saw based on a contract between the distributor and manufacturer. The plaintiff claimed the manufacturer "failed to honor the warranties in the … contract," but argued it was not bound to the contract's arbitration clause because it had not signed. *Id.* at 416-18. The Second Circuit disagreed, observing that the third-party contract "provides part of the factual foundation for every claim asserted by [plaintiff]" and plaintiff's "entire case hinges on its asserted rights" under that contract. *Id.* at 418. The Court could "only conclude that [plaintiff] is estopped from refusing to arbitrate its dispute," and rejected plaintiff's attempt to "enforce … rights" under the contract while "avoid[ing] the contract's [arbitration] requirement." *Id.*

The court reached the same conclusion in *Raebel v. Tesla*, on strikingly similar facts. There, two plaintiffs sued Tesla, alleging "sudden unintended acceleration." 2020 WL 1659929, at *3. Plaintiffs alleged that "Tesla and ***Plaintiffs*** entered into the Motor Vehicle Purchase Agreement," yet one of them tried to avoid arbitration because he did not personally click Tesla's online

---

[5] Cases in this circuit and around the country are in accord. *See, e.g.*, *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (discussed in detail below); *Atkins v. CGI Techs. & Sols., Inc.*, 339 F. Supp. 3d 619, 630 (E.D. Ky. 2018) (nonsignatory sued for breach of contract seeking a direct benefit under the agreement; court held that "[plaintiff] cannot pick and choose pieces of the contract to which she wants to be bound. Because [plaintiff] has sued under a breach of contract theory, she is also bound to the arbitration clause."); *Ripmaster v. Toyoda Gosei, Co., Ltd.*, 824 F. Supp. 116, 117 (E.D. Mich. 1993) (nonsignatory bound to arbitration agreement in contract he invoked in litigation as third-party beneficiary); *Sam Houston Elec. Coop., Inc. v. Berry*, 582 S.W.3d 282, 290 (Tex. App. 2017) ("[I]t is the very principle of the doctrine of direct benefits estoppel that prevents a party from enforcing the parts of a contract that benefit him while seeking to invalidate the parts that do not."); *cf., e.g.*, *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (nonsignatory estopped from refusing to arbitrate "when it receives a 'direct benefit' from a contract containing an arbitration clause").

agreement. *Id.* The court rejected that claim under a judicial admission theory, explaining "[h]aving already admitted that both Plaintiffs entered into the Agreement with Tesla, Plaintiffs cannot now claim that [the nonsignatory plaintiff] never assented to the Agreement." *Id.*

Consistent with *International Paper*, *Raebel*, and decisions around the country, Mrs. Gala's Complaint here binds her to the arbitration agreement. Mrs. Gala repeatedly asserts the existence of a valid Lease Agreement between herself (along with Mr. Gala) and Tesla. *See, e.g.*, Compl. ¶ 7 ("…***Plaintiffs*** leased a 2019 Model S…. A copy of the Lease Agreement is attached hereto…"); ¶ 9 (alleging that "***Plaintiffs*** executed the … lease); ¶ 26 ("The parties contracted to lease the vehicle to the ***Plaintiffs***…"); ¶¶ 33-34 (alleging that "***Plaintiffs***" were relying on Defendant's representations about the vehicle); p. 7 (seeking rescission of Tesla's "contract with the ***Plaintiffs*** to lease the vehicle...") (emphases added). She also asserts six claims for relief— breach of the Lease Agreement, rescission of the Lease Agreement, warranty claims arising from the Lease Agreement, and a claim that Tesla's alleged misrepresentations "induced" the Lease— all of which arise from and depend on the Lease Agreement itself. Compl. ¶¶ 15-34. Mrs. Gala cannot premise her claims on a contract and related warranties, while at the same denying the arbitration clause in that same contract. *Int'l Paper*, 206 F.3d at 418; *Benton*, 137 S.W.3d at 620 (arbitration enforceable against third party suing to enforce the contract); *Harvey*, 532 S.W.3d at 271 (same); *Raebel*, 2020 WL 1659929, at *3 (same with respect to Tesla's online Order Agreement). Mrs. Gala is estopped from seeking to avoid arbitration, and she too must arbitrate.

### E. The Court Should Dismiss the Case.

Because all of Plaintiffs' claims are subject to arbitration, Tesla respectfully requests that the Court dismiss the case. *Fondren v. Am. Home Shield Corp.*, No. 17-CV-2519-SHM-DKV, 2018 WL 3414322, at *3 (W.D. Tenn. July 13, 2018) (affirming magistrate order compelling

14

arbitration and dismissing the case because "all claims in this lawsuit are subject to arbitration"); *see also Sevier Cnty. Sch. Fed. Credit Union v. Branch Banking & Tr. Co.*, No. 3:19-CV-138, 2020 WL 130136, at *12 (E.D. Tenn. Jan. 10, 2020) (collecting cases) ("Courts in this circuit have recognized that dismissal, rather than a stay of proceedings, can be appropriate when all of the claims in a particular suit will be referred to arbitration").

### IV.     CONCLUSION

Plaintiffs are bound to the terms of the agreements that Mr. Gala signed, and that both Plaintiffs invoke in this lawsuit. The Complaint should be dismissed in favor of arbitration as to both Plaintiffs.

DATED this 15th day of May, 2020.

    Respectfully submitted,

    LEWIS, THOMASON, KING,
    KRIEG & WALDROP, P.C.

    By: /s/ J. Randolph Bibb, Jr.
    J. Randolph Bibb, Jr., B.P.R. No. 009350
    424 Church Street, Suite 2500
    Post Office Box 198615
    Nashville, Tennessee 37219
    (615) 259-1349 (telephone)
    (615) 259-1389 (facsimile)
    rbibb@lewisthomason.com

    *Counsel for Defendants*
    *Tesla Motors TN, Inc.*
    *and Tesla, Inc.*

## **CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that on May 15, 2020, a true and exact copy of the foregoing Memorandum of Law has been served upon counsel for the parties in interest herein by the Court's ECF system or by United States Mail with sufficient postage thereon to carry the same to its destination:

  Kevin A. Snider, Esq.
  B.P.R. No. 018231
  SNIDER & HORNER, PLLC
  9056 Stone Walk Place
  Germantown, Tennessee 38138
  (901) 751-3777 (telephone)
  (901) 759-0041 (facsimile)
  ksnider@kevinsnider.com

  *Counsel for Plaintiffs*

  /s/ J. Randolph Bibb, Jr.
  J. Randolph Bibb, Jr.